1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ELAINE ZETTY,

                Plaintiff,

    v.

JO ANNE B. BARNHART, Commissioner of
Social Security Administration,

                Defendant.

CASE NO.    C05-5585RBL

REPORT AND
RECOMMENDATION

Noted for September 1, 2006

This matter has been referred to Magistrate Judge J. Kelley Arnold pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by <u>Mathews, secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976). This matter has been fully briefed. After carefully reviewing the record, the undersigned recommends that the Court reverse the administrative decision and remand the matter for an award of appropriate benefits.

<u>FACTUAL BACKGROUND</u>

Plaintiff, Elaine Zetty, was born in 1949. Plaintiff's history was summarized by Dr, Corpolongo, to whom she was referred for a psychological evaluation in 1999. Dr. Corpolongo reported the following.

<u>Client Complaints</u>: Ms. Zetty states her basic problems are "I don't have skills or would qualify for anything. I can't stand or lift, and it's kind of hard to sit for any length of time. . . My hands will ache if I do anything repetitive."

<u>History</u>: The following history was elicited from Ms. Zetty during the course of this evaluation. She has one older brother. Both parents are deceased. She and her older brother were adopted at birth. She has no knowledge of her biological parents. When describing her adoptive father she stated, "Yeah. Fine. It was okay, but what he said went. He was real strict." in describing her mother she stated, "Okay. She was on the stricter side to. Had a lot

of chores . . . We lived on a farm." Her relationship with her brother was "like brother and sister - fought like cats and dogs until we got older."

She knows of no problems with her pregnancy or delivery. She reports no developmental delays. Her back was "naturally fused" at birth. Early childhood medical history was accentuated by "headaches ever since I can remember." She reports no head injury and had a "brain scan in my 20's, but it was okay." She was involved in a car wreck at 18 but not hospitalized. She had chronic leg pain throughout her childhood. She broke her leg in 1983 and was hospitalized for nine days having an implanted steel rod. She began attending school in the first grade and was never held back. She denies ever being in special education classes and was generally a "C" to above-average student. She denies ever having any behavior problems in school. She describes herself by stating, "I was a little tomboy - chased the girls with snakes and toads. Kind of a loner only hanging out with a couple friends, It's always been that way." Once she attended junior high, she became even more socially isolated. She continued to relate to one or two friends. At age 12 she began drinking. By the time she was in high school she drank "every chance I could get" which translated usually to every weekend. At age 15 or 16 she also began smoking marijuana every weekend. During her high school years she "hung out with a group" of friends from her local area.

Inexplicably in her senior year (1968) she became "fed up with school" and dropped out. From 1969 to 1972 she sporadically attended Olympic College and ultimately obtained her high school diploma. She continued to live at home. She worked six months right after leaving high school at a fast food burger stand. Her first sexual relationship began at age 18. The relationship broke up after six to eight months. As to the reason, she states, "not really sure. We just did." She became pregnant with her first child at age 19 and gave birth to Michael (currently age 29) when she was 20. She went on welfare at that time. She was married at age 19 and remained married for approximately a year. This marriage ended due to his abuse. He abandoned her by moving back to Canada.

She continued on welfare and married the second time at age 21. This marriage also lasted a year. They just "didn't get along well, and we just split." After age 21 she began drinking on a binge basis. She drank for two to three days and then not for three or four. She was also smoking marijuana at least one time monthly. She married for the third time at age 24 when she was pregnant with her second child, Kenny (currently age 24). This relationship lasted two years. They split because "he wanted to party and was unfaithful." During this marriage she went off welfare and worked for six months at the Bremerton Officers Club as a waitress. She tried to attend Olympic College two to three times between the ages of 23 to 27. However, she could not complete studies because of stresses with the children. At age 26 she worked as a waitress at The Poplars Restaurant for approximately a year and was drinking when she got off early and on the weekends. At age 27 she worked for approximately a year at the Golden Star Restaurant. At age 28 she was again living alone and subsisting on welfare.

At age 29 she married for the fourth time, and at age 31 she had her third child, Angela (currently age 18). This marriage lasted three-and.-a-half years during which she was "drinking a lot on a daily basis." After having Angela she worked for approximately three months at the Quilicene Café. She had a hysterectomy secondary to problems related to a bladder repair due to her pregnancy. She didn't drink when she was pregnant nor when she was nursing. However, once she discontinued nursing she resumed drinking on almost a daily basis. Her fourth marriage broke up due to domestic violence. She had him arrested [and] he filed for divorce. She resumed welfare at age 33 or 34.

She then moved to the Brownsville area where she lived for approximately four years and had two live-in male friends. She was drinking at least three to four times weekly. At age 38 she began taking medication for her headaches. She also was medicated for stress. During

that time she had moved to Belfair, and her attending physician placed her on sleeping medication, pain killers, and Buspar for stress. She was in chronic back pain. In 1984 or 1985 she obtained her first DWI and was given some jail time, fined, and then released.

After she moved to Belfair, Washington in 1987 she began drinking three times a week. However, her marijuana use began decreasing. She was only smoking once every three or four months. She states that she has not smoked marijuana for the last ten years. In 1987 or 1988 she was given doxepin to sleep, Buspar for anxiety, Soma for muscle relaxation, and was taking ibuprofen for pain. She last worked at the Park Place Grocery in 1988 for four months as clerk/cashier. She has not worked since that time and has been subsidized on welfare. In 1988 she obtained two DWI's in fairly rapid succession. She went to jail however just didn't go to court. She has not had a driver's license since that time however still drives.

After 1988 her history becomes quite vague without significant milestones. Apparently she lived in a mobile home court and became embroiled in problems with a neighbor. Between 1990 to 1991 her drinking slowed to approximately one time a week due to gastrointestinal problems. By 1992 she was drinking one time a month which is the pattern she continues at the present time.

Her daughter moved to reside with her father in 1994 and between 1994 to 1997 Mr. Zetty lived alone in a travel trailer. In 1997 she obtained a one-bedroom house in Silverdale. At that time she was taking care of her son's children. In 1998 she moved in with her oldest son and his wife in Bremerton. At the present she continues to live with this family in their basement.

<u>Substance Abuse History</u>: Clearly Ms. Zetty presents a history of alcohol abuse starting in early adolescence and extending to approximately her mid-40's. She has received three DWI's, and drinking has been a basic contributing and motivating factor for her socialization. She admits to drinking on a daily basis. She openly admits to being alcoholic. She has never undergone any treatment. She states that she continues to drink on a once-a-month basis. At the present time she believes that alcohol is not a significant problem in her life. However, an alcohol evaluation may be indicated based upon her prior history of abuse.

There is also an extended period of use of marijuana. She states that she has abstained from marijuana use for at least ten years. It is not her drug of choice. There is not sufficient evidence to diagnose a substance abuse disorder based upon her presentation of signs and symptoms during this evaluation.

<u>Medical/Psychiatric History</u>: Medical history in this case is quite vague and nonspecific. She states that her back was naturally fused at birth. She has chronic migraine headaches since early childhood and chronic pain in her joints. She states that she had an appendectomy at age 12 and was involved in a serious car accident at age 18 in which she was thrown through the back window but never received any medical attention. Her headaches apparently became severe enough to require a "brain scan" in her early 20's that proved negative. She has had chronic back, shoulder, and joint pain. She had a hysterectomy in her early 30's and broke a leg in her mid-30's that required hospitalization and a steel bar implantation. Current medical diagnoses include COPD, high blood pressure, and chronic pain.

Psychiatric history is limited to receiving medications to help her sleep and reduce stress and depression. She states that she's been receiving these medications since 1987 or 1988. She denies any hospitalizations or ever being seen by a psychiatrist except for psychiatric evaluations by Dr. Mike O'Leary on 09/15/98 and 03/02/99. These evaluations yielded the diagnoses of Dysthymia, childhood onset; Major Depression due to a general medical

condition; Avoidant Personality Disorder; and Stress-Related Physiological Response affecting medical condition.

<u>Adaptive Functioning</u>: Ms. Zetty states that she is totally independent in self-care and is competent to perform all her activities of daily living (ADL's). She is only limited by physiological pain. She drives, does her own laundry and grocery shopping, purchases her own clothes, and cooks. She states that she manages her own money and has no problems.tn keeping money now that she uses direct deposit which prohibits her son from stealing from her.

She spends her usual day by arising at 8:30, going to the bathroom, making coffee, and taking the dog out for a walk. She will then return home, drink coffee, turn on the TV, and do light chores possibly showering at eleven or twelve o'clock. Around twelve or one she'll have a sandwich or some light lunch, take the dog out for a walk, and again do household chores during the afternoon. She will continue to watch TV, and will prepare and have dinner around six or seven. She will then watch TV for the remainder of the day retiring at eleven or twelve.

Socially, she is isolated to her family. She has no hobbies and no specific interests. She does not belong to any group, club, or organization and has not been involved in a relationship since the late 1980's. She states that she doesn't trust people since she has been "stabbed in the back so many times." She "don't give a damn what people think" however just is avoiding becoming used or hurt. She admits to a pattern of social inhibition, feelings of inadequacy, and hypersensitivity. She avoids significant interpersonal contact because of fear of criticism or disapproval; is inhibited in new interpersonal relationship situations because of feelings of inadequacy; views herself as socially inept, unappealing, and inferior; and is usually reluctant to take personal risks or engage in any new activities. She meets the diagnostic criteria for 301.82 Avoidant Personality Disorder,

In general, she feels that her condition is remaining somewhat stable. However, her medical condition and chronic pain are increasing. She does not feel that she is able to work and is applying for disability.

Tr. 215- 218

Plaintiff filed an application for SSI disability benefits on November 21, 1997, alleging that she became disabled in January 10, 1995, due to hip pain, arthritis in the right shoulder, and elbow pain (Tr. 17, 55-57). Her application was denied initially and at the reconsideration level (Tr. 17, 522-42). Plaintiff appealed the decision to the Appeals Council, which remanded the matter on June 19, 2001 (Tr. 17). A hearing on remand was held on August 6, 2002, at which time the ALJ heard testimony from Plaintiff, a vocational expert; and, Tia Pesicka, a witness for Plaintiff (Tr. 543- 77). On December 7, 2002, the ALJ issued a decision again denying Plaintiff's application (Tr. 17- 32). Plaintiff requested that the Appeals Council review the ALJ's decision, who denied Plaintiff's request for review, making the ALJ's second decision the Commissioner's final decision (Tr. 10-12). *See* 20 C.F.R. §§ 416.1481, 422.210.

A timely Complaint was subsequently filed in this Court for judicial review of the final administrative decision. In her Opening Brief, Ms. Zetty argues the ALJ and the administration's decision is

erroneous and asserts the court should reverse the administrative decision and award benefits.  Specifically, Ms. Zetty argues the following errors: (i) the ALJ failed to properly consider the opinions and reports of Dr. Butler, Dr. O'Leary, and Dr. Corpolongo; (ii) the ALJ erred when he assessed Ms. Zetty's credibility and the credibility of the lay witness; (iii) the ALJ erred in his assessment of Ms. Zetty's residual functional capacity; and (iv) the ALJ's hypothetical posed to the vocational expert failed to include all of Ms. Zetty's impairments.  After reviewing the record, particularly defendant's opposition to the arguments outlined above, this court finds the ALJ improperly considered the medical evidence.  Moreover, the record is complete and the administrative decision should be reversed and the matter should be remanded for an award of appropriate benefits.

### DISCUSSION

The Commissioner's decision must be upheld if the ALJ applied the proper legal standard and the decision is supported by substantial evidence in the record.  Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 525 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, this Court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

### THE ALJ ERRED WHEN HE EVALUATED THE MEDICAL EVIDENCE

The ALJ is entitled to resolve conflicts in the medical evidence.  Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987).  He may not, however, substitute his own opinion for that of qualified medical experts.  Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982).  If a treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for doing so.  Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983). " The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."  Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1996).

Here, Plaintiff argues the ALJ improperly considered the medical evidence of record, specifically the opinions of Dr. Butler, Dr. O'Leary, and Dr. Corpolongo.  The undersigned agrees.

When the Administration's appeals council remanded the ALJ's decision in 2001, it directed the ALJ to "give greater consideration to treating and examining source opinions including the claimant's mental impairments."  (Tr. 17).  In his decision, the ALJ summarized the medical evidence (Tr. 19-25), and concluded the medical evidence indicated Ms. Zetty suffered from a lumbar sprain, hip pain and a personality disorder.  The ALJ wrote, "The claimant has no evidence of muscle weakness, sensation loss, reflex loss or nerve root impingement sufficient to meet the requirements of listing 1.04.  Her personality disorder does not cause her any marked limitations under the B criteria.  She has moderate limitations in social functioning and increased physical symptoms with increased stress, but nothing that causes marked limitations in concentration, persistence or pace; social functioning; and activities of daily living.  She has never had an episode of decompensation."  (Tr. 27).  The ALJ's decision, specifically regarding the medical evidence and Ms. Zetty's mental impairments, is not supported by the record.

Dr. Butler was Plaintiff's treating physician.  The record shows he cared for Plaintiff's back, shoulder, and elbow pain, COPD, anxiety, depression and other impairments during numerous office visits, with frequent medication management and prescription refills.  Dr. Butler repeatedly prescribed anti-anxiety medication such as BusDar and anti-depressant medications such as Prozac and Doxepin.  On April 26, 1999, Dr. Butler specifically noted Plaintiff's symptoms of depression and anxiety, and he opined that Plaintiff suffered from "marked" difficulties in maintaining social functioning, "marked" deficiencies of concentration, persistence and pace resulting in the failure to complete tasks in a timely manner, and "marked" episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw.  On January 13, 2000, Dr. Butler opined that Plaintiff continued to suffer limitations from her impairments which precluded her from working.

Dr O'Leary performed psychological evaluations of Plaintiff on August 19, 1998, and September 15, 1998, and he opined that Plaintiff suffered from depression due to her medical condition, childhood onset dysthymia and stress-related physiological reactions affecting medical. Dr. O'Leary found that Plaintiff suffered "marked" limitations in the following areas: depressed mood, social withdrawal, ability to exercise judgment, ability to relate appropriately to co-workers and supervisors, ability to interact

1   appropriately in public contexts and ability to respond appropriately to and tolerate the pressures and

2   expectations of a normal work setting. Dr. O'Leary based his findings on psychological testing and his own

3   personal observations of Plaintiff.  Dr. O'Leary's psychological evaluation dated January 11, 2000, indicated

4   that Plaintiff continued to suffer "marked" limitations from her psychological impairments.  In each of his

5   three evaluations, Dr. O'Leary opined that Plaintiff was "chronically mentally ill."

6          Dr. Corpolongo performed a psychological examination of Plaintiff on April 7, 1999.  He utilized an

7   array of psychological tests including the MMPI-2, the results which were deemed "valid."  The test results

8   indicated a level of intensity that might reflect high levels of stress.  Dr. Corpolongo stated that it appeared

9   in general that Plaintiff "was honest in her presentation and may have been minimizing some of her

10  psychological problems."  Dr. Corpolongo opined that Plaintiff had a generalized anxiety disorder,

11  dysthymia, major, recurrent, severe depressive disorder, an avoidant personality disorder and an

12  obsessive/compulsive personality disorder, Dr. Corpolongo rating Plaintiff's GAF score at 50.

13         As noted above, the ALJ concluded that Ms. Zetty's only severe mental impairment was a

14  personality disorder and concluded that despite this impairment, she could perform work in a fairly low

15  stress environment without a lot of noise, distractions, crowds or the general public (Tr. 31). In arriving at

16  these conclusions, the ALJ necessarily rejected the determination of treating physician Dr. Butler, who

17  found that Ms. Zetty had significant limitations due to depression and the report of Dr. Corpolongo, who

18  found that due to a generalized anxiety disorder, dysthymia; a major depressive disorder, an avoidant

19  personality disorder and an obsessive compulsive personality disorder.

20         The ALJ improperly rejected the opinion of Dr. Butler.  The ALJ discounted Dr. Butler's treatment

21  of Ms. Zetty's mental impairments. He wrote, "Dr. Butler completed a statement that the claimant had very

22  severe depression, but the record does not show that he has ever referred the claimant for counseling or

23  psychiatric care.  Dr. Butler is not a psychiatrist and this opinion is outside his realm of expertise."  As to

24  whether Dr. Butler's treatment records established the degree of limitation he found, the frequency

25  of treatment  supports the limitations he provided and he consistently noted Ms.Zetty's complaints of pain.

26  The ALJ's rejection of Dr. Butler's opinion because he was not a specialist is not legitimate.  Dr. Butler is

27  an educated and licensed physician, plaintiff's treating physician, who prescribed drugs to treat Ms. Zetty's

28  mental impairments.  It was improper for the ALJ to categorically discount Dr. Butler's opinion and

REPORT AND RECOMMENDATION
Page - 7

1   statements regarding Ms. Zetty's mental condition on the basis that he is not a psychiatrist or offering an

2   opinion outside of his expertise.

3          When he considered the opinion of Dr. O'Leary, the ALJ determined that Dr. O'Leary's opinion

4   was suspect because it relied on Plaintiff's subjective complaints of pain and because Dr. O'Leary was

5   acting as an advocate for Ms. Zetty in plaintiff's pursuit of disability benefits.   Although Dr. O'Leary's

6   reports reference Ms. Zetty's pain complaints, there is no evidence that he was relying solely or even

7   primarily on her reports of pain in arriving at his conclusions about mental limitations as suggested by the

8   ALJ.  In September 1998, Dr. O'Leary noted Ms. Zetty she was experiencing severe mood swings (Tr.

9   169).  In 2002, he administered the personality assessment inventory (PAI), which was valid and showed

10  that she had significant problems, including significant elevations across several scales, "associated with

11  marked distress and severe impairment in functioning" (Tr. 467).  The notion that a physician's opinion is

12  less credible because it was produced at the request of particular party is not a legitimate basis for the ALJ

13  to rely upon to reject or discount a medical opinion.  Dr. O'Leary's opinion was improperly rejected by the

14  ALJ.

15         The ALJ similarly improperly discounted the opinion of Dr. Corpolongo.  Dr. Corpolongo

16  suspected that Ms. Zetty had somatoform disorder.  This opinion is corroborated by Dr. Gutierrez, who

17  found that the diagnosis of a somatization disorder, was "most probable,"and  which Dr. Lenza agreed.

18  Dr. O'Leary also diagnosed a "stress related physiological symptoms affecting medical conditions.   The

19  ALJ erred when he failed to find that Ms. Zetty's somatization disorder was severe.  The ALJ did not

20  include any kind of somatoform disorder in his evaluation of Ms. Zetty's mental impairments.

21         After reviewing the record, this court finds the ALJ's analysis of the medical evidence was

22  improper.  Specifically, the court finds the ALJ improperly rejected the opinions of Dr. Butler, plaintiff's

23  treating physician, Dr. O'Leary and Dr. Corpolongo.  The court further finds the opinions of Dr. Butler,

24  Dr. O'Leary and Dr. Corpolongo support a finding that Ms. Zetty personality disorder or mental

25  impairments cause her marked limitations and more than moderate limitations in social functioning and

26  increased physical symptoms with increased stress.

27         Significantly, the court finds that if the medical evidence was properly considered regarding the

28  mental impairment, Ms. Zetty would be have only a residual functional capacity to perform sedentary work,

1  and based on Medical-Vocational Rule 201.14, Ms. Zetty would be entitled to benefits commencing on her

2  50th birthday, November 15, 1999.  The record is fully developed and there is no need to remand the matter

3  for further proceedings.

4                                                    CONCLUSION

5        Based on the foregoing discussion, the administrative decision should be reversed.  Plaintiff is found

6  to have be disabled, beginning November 15, 1999, and the matter should be remanded for an award of

7  appropriate benefits.

8        Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the

9  parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P.

10  6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v.

11  Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the clerk is directed to

12  set the matter for consideration on **September 1, 2006**, as noted in the caption.

13        DATED this 11th day of August, 2006.

14                                             */s/ J. Kelley Arnold*
                                             J. Kelley Arnold
15                                             U.S. Magistrate Judge

REPORT AND RECOMMENDATION
Page - 9